# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARDIONET, LLC, | ) |
| | ) |
| and | ) Civil Action No. 1:15-cv-11803-IT |
| | ) |
| BRAEMAR MANUFACTURING, LLC, | ) |
| | ) Hon. Indira Talwani |
| Plaintiffs, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| INFOBIONIC, INC., | ) Leave to file granted on March 23, 2016 |
| | ) |
| Defendant. | ) |
| | ) |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs CardioNet, LLC and Braemar Manufacturing, LLC (collectively, "CardioNet"), for their Second Amended Complaint against InfoBionic, Inc. ("InfoBionic"), allege as follows:

## THE PARTIES

1.     Plaintiff CardioNet, LLC is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1000 Cedar Hollow Road, Malvern, PA  19355.  CardioNet is a leading provider of ambulatory outpatient management solutions for monitoring clinical information regarding an individual's health.

2.     Plaintiff Braemar Manufacturing, LLC ("Braemar") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1285 Corporate Center Drive, Suite 150, Eagan, MN  55121.  Braemar develops and manufactures ambulatory cardiac monitors for leading healthcare companies.

1

3.      Upon information and belief, defendant InfoBionic, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 600 Suffolk Street, Lowell, MA  01854.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code; for misappropriation of trade secrets under Massachusetts General Laws, Chapter 93, § 42 and Massachusetts Common Law; for violation of Pennsylvania's Uniform Trade Secrets Act; for unfair competition under Massachusetts General Laws, Chapter 93A, and Pennsylvania Common Law; and for tortious interference with contractual relations under Massachusetts Common Law.

5.      This Court has jurisdiction over CardioNet's patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Court has supplemental jurisdiction over CardioNet's state law claims under 28 U.S.C. § 1367 and 1338(b).

6.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## FACTS

8.      U.S. Patent No. 6,940,403 (the "'403 patent"), entitled "Reprogrammable Remote Sensor Monitoring System," was duly and legally issued on September 6, 2005.  CardioNet, Inc. was the original owner by assignment of all right, title, and interest in and to the '403 patent,

including without limitation the right to sue and recover for past infringement thereof.  A copy of the '403 patent is attached as Exhibit A to this Complaint.

9.      U.S. Patent No. 6,225,901 (the "'901 patent"), entitled "Reprogrammable Remote Sensor Monitoring System," was duly and legally issued on May 1, 2001.  CardioNet, Inc. was the original owner by assignment of all right, title, and interest in and to the '901 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '901 patent is attached as Exhibit B to this Complaint.

10.     U.S. Patent 7,212,850 (the "'850 patent"), entitled "System and Method for Processing and Presenting Arrhythmia Information to Facilitate Heart Arrhythmia Identification and Treatment," was duly and legally issued on May 1, 2007.  CardioNet, Inc. was the original owner by assignment of all right, title, and interest in and to the '850 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '850 patent is attached as Exhibit C to this Complaint.

11.     U.S. Patent 7,907,996 (the "'996 patent"), entitled "System and Method for Processing and Presenting Arrhythmia Information to Facilitate Heart Arrhythmia Identification and Treatment," was duly and legally issued on March 15, 2011.  CardioNet, Inc. was the original owner by assignment of all right, title, and interest in and to the '996 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '996 patent is attached as Exhibit D to this Complaint.

12.     U.S. Patent No. RE43,767 (the "'767 patent"), entitled "Control of Data Transmission Between a Remote Monitoring Unit and a Central Unit," was duly and legally (re)issued on October 23, 2012.  The '767 patent is a reissue of U.S. Patent No. 6,694,177 which was duly and legally issued on February 17, 2004.  CardioNet, Inc. was the original owner by

assignment of all right, title, and interest in and to the '767 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '767 patent is attached as Exhibit L to this Complaint.

13.     U.S. Patent No. 7,099,715 (the "'715 patent"), entitled "Distributed Cardiac Activity Monitoring with Selective Filtering," was duly and legally issued on August 29, 2006. CardioNet, Inc. was the original owner by assignment of all right, title, and interest in and to the '715 patent, including without limitation the right to sue and recover for past infringement thereof.  A copy of the '715 patent is attached as Exhibit M to this Complaint.

14.     On December 31, 2012, CardioNet, Inc. assigned all right, title, and interest in and to the '403 patent, '901 patent, '850 patent, '996 patent, '767 patent, and '715 patent (collectively, the "patents-in-suit") to Braemar.  Effective the same day, Braemar granted CardioNet, Inc. an exclusive license to make, use, offer to sell, sell, import, license, and exploit the patents-in-suit.  The license grants CardioNet, Inc. an exclusive license to the patents-in-suit in the field of applications and services for the monitoring and monitoring-related services of medical monitoring and diagnostic devices, while all other rights, title, and interest in the patents-in-suit are retained by Braemar.  CardioNet, Inc. is now CardioNet, LLC as confirmed by an August 1, 2013 Certificate of Conversion to Limited Liability Company of CardioNet, Inc. (a Delaware corporation) to CardioNet, LLC (a Delaware limited liability company) filed with the Secretary of State for the State of Delaware.

15.     CardioNet's Mobile Cardiac Outpatient Telementry$^{TM}$ (MCOT$^{TM}$) is a market leader in the field of Mobile Cardiac Telemetry ("MCT").  The CardioNet MCOT$^{TM}$ was the first commercialized MCT device on the market and was the result of substantial investment by

CardioNet. The CardioNet MCOT$^{TM}$ includes beat-to-beat, real-time analysis, automatic arrhythmia detection, and wireless ECG transmission.

16.     CardioNet spends millions of dollars per year developing new technologies and protecting its inventions, including by filing for and obtaining United States patents. CardioNet has also taken steps to protect its trade secret information, including by limiting access to this information and requiring employees to sign nondisclosure and confidentiality agreements.

17.     On information and belief, InfoBionic was founded in 2011. InfoBionic states that it "empowers physicians with the control they need to transform the efficiency with which they monitor and diagnose patients with cardiac arrhythmias." (Ex. E (5/7/2015 capture of http://infobionic.com/our-story/), pg. 1.)

18.     InfoBionic claims that its "MoMe® Kardia system is the first and only wireless remote patient monitoring platform to bring all aspects of cardiac arrhythmia detection and monitoring management under physicians' direct control…." (Ex. F (5/7/2015 capture of http://infobionic.com/the-system/), pg. 1.) The MoMe® Kardia System is a "single universal device" that "enables physicians to remotely transition between Holter, Event, and MCT technologies based on patient need at any given time during their monitoring period." (*Id.* at pg. 2.)

19.     Upon information and belief, defendant InfoBionic actively solicits and does business throughout this Judicial District, including making, using, offering for use, selling, offering for sale, and/or importing the MoMe® Kardia System, including the MoMe® Kardia device that records and transmits a patient's electrocardiographic signal and the MoMe® Kardia cloud server that detects arrhythmias and enables human review of arrhythmia data.

20.     InfoBionic's MoMe® Kardia System directly competes with CardioNet's

MCOT[TM] System.  InfoBionic has stated publicly that CardioNet "is one of the companies we

are trying to disrupt with the MoMe[TM] system."  (Ex. G (5/7/2015 capture of

http://www.wpiventureforum.org/monthly10912.html), pg. 2.)[1]

21.     The 510(k) submission for the MoMe® Kardia System relied upon CardioNet's

MCOT[TM] device as one of two predicate devices.  (Ex. H (Traditional 510(k) Premarket

Notification for InfoBionic MoMe[TM] System), pgs. 5 and 7.)  The 510(k) submission states that

"[t]he MoMe System Indications for use are aligned with both the CardioNet and Preventice

Indications" and that "[a]ll three devices are monitoring devices and are classified under the

same FDA classification code of 21 CFR 870.1025, DSI."  (*Id.* at pg. 8.)

22.     At least four of the seven members of the InfoBionic management team as it

existed on the date of this filing were previously employed by CardioNet:  Ms. Anna McNamara;

Mr. Chris Strasinski; Mr. Philip Leone; and Mr. Bill Swavely.  (Ex. I (5/7/2015 capture of

http://infobionic.com/management-team/).)  Additionally, Dr. Ravi Kuppuraj was a member of

the InfoBionic management team at least as recently as January 2015 and also was previously

employed by CardioNet.  (Ex. J (1/8/2015 capture of http://infobionic.com/persons/ravi-

kuppuraj-phd/).)

23.     Dr. Ravi Kuppuraj was the Chief Technology Office & Co-Founder of InfoBionic

at least as recently as January 2015.  (Ex. J.)  He joined CardioNet in January 2001 as the

Director of ECG Analysis.  His responsibilities included the development of CardioNet's cardiac

---

[1]     On information and belief, InfoBionic added "Kardia" to the original MoMe® name.
Accordingly, certain exhibits cited herein refer to the system as simply the "MoMe System".  As
used herein, MoMe® (with or without "Kardia") refers to any system that can be marketed
pursuant to 510(k) No. K133753.  As ordered by the Court:  "Unless otherwise ordered,
discovery into alleged infringement in this litigation shall be limited to information related to a
system that can be marketed pursuant to 510(k) No. K133753."  D.I. 53.

arrhythmia detection algorithms.  InfoBionic described Dr. Kuppuraj as "an integral team member that developed and launched CarioNet's revolutionary Mobile Cardiac Outpatient Telemetry (MCOT) product."  (Ex. J.)

24.     On or around November 8, 2000, prior to beginning his term of employment with CardioNet, Dr. Kuppuraj signed a Confidentiality and Non-Disclosure Agreement, under which he agreed that he would not reveal CardioNet's confidential information at any time, would not use such information to the benefit of a third party or to injure or cause loss to CardioNet, and would return confidential information in his possession to CardioNet.

25.     On or around January 16, 2001, Dr. Kuppuraj was appointed the Director of ECG for CardioNet and, in consideration of his continued employment, entered into agreements with CardioNet, including an "At-Will Employment Agreement" (hereinafter "Employment Agreement") and a "Proprietary Information and Inventions Agreement" (hereinafter "Proprietary Information Agreement").  Dr. Kuppuraj acknowledged in the Proprietary Information Agreement that during his employment at CardioNet he would be given, and have access to, confidential and proprietary information belonging to CardioNet, and agreed to maintain the confidentiality of all such information at all times.  The Proprietary Information Agreement also obligated Dr. Kuppuraj to return all such property and information to CardioNet upon the termination of his employment.

26.     As Director of ECG Analysis for CardioNet, Dr. Kuppuraj had access to CardioNet's confidential, proprietary, and/or trade secret information, including but not limited to CardioNet's source code for its MCOT[TM] System.  During his employment with CardioNet, Dr. Kuppuraj developed and worked on the underlying source code for CardioNet's MCOT[TM] System, including algorithms for the detection of atrial fibrillation in a cardiac signal.

27.     On December 15, 2002, Dr. Kuppuraj's employment with CardioNet ended.  At that point, Dr. Kuppuraj was under an obligation to return any and all confidential information, and under a continuing obligation not to use or distribute CardioNet's confidential information.

28.     Upon information and belief, at the conclusion of his employment with CardioNet, Dr. Kuppuraj improperly accessed, copied, removed, and/or retained CardioNet's confidential information including, at least, portions of the source code written for CardioNet's MCOT™ System (hereinafter "the copied CardioNet source code").

29.     Upon information and belief, InfoBionic used the copied CardioNet source code in the design and development of InfoBionic's MoMe™ System.  In particular, large portions of the copied CardioNet source code appear verbatim in the source code produced by InfoBionic in this litigation in response to CardioNet's Requests for Production.

30.     Ms. Anna McNamara is the Executive Vice President, Global Clinical Operations, at InfoBionic.  (Ex. I, pg. 4.)  Ms. McNamara was employed by CardioNet for over 10 years. She ultimately served as Senior Vice President, Clinical Operations and Research at CardioNet. (*Id.*)  While at CardioNet, Ms. McNamara "built the clinical operations department for a new wireless technology" which "included developing and managing the clinical service, creating the clinical research strategy, training and support for sales and marketing, working with R&D on technology and software development and managing the Medical Advisory Board."  (*Id.*)  Upon information and belief, when Ms. McNamara left CardioNet in November 2013 she left to join InfoBionic.

31.     Mr. Chris Strasinski is the Executive Vice President, Sales and Marketing, at InfoBionic.  (Ex. I, pgs. 2-3.)  Mr. Strasinski previously "held various sales roles at CardioNet culminating in Senior Vice President Sales" and his "[s]ignificant achievements [at CardioNet]

included hiring over 80 sales representatives, acquiring synergistic businesses, and delivering significant market share gains." *(Id.)*

30.     Mr. Philip Leone is the Executive Vice President, Reimbursement at InfoBionic. (Ex. I, pg. 3.)  Mr. Leone was previously employed by CardioNet, "culminating as the Senior Vice President of Reimbursement Services & Compliance and a Corporate Officer." *(Id.)*  His employment with CardioNet ended in April 2011.

31.     Mr. Bill Swavely is the Chief Innovation Officer at InfoBionic.  (Ex. I, pg. 5.) Mr. Swavely was previously employed as the Vice President of Information Technology at CardioNet.  His employment with CardioNet ended in August 2014 when he, upon information and belief, left to join InfoBionic.

## COUNT I - INFRINGEMENT OF '403 PATENT

32.     InfoBionic has infringed and is continuing to infringe the '403 patent by making, using, selling, offering for sale, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions covered by the '403 patent, including but not limited to the MoMe® Kardia System, thereby infringing one or more claims of the '403 patent.

33.     InfoBionic's MoMe® Kardia System satisfies each and every element of one or more claims of the '403 patent, for example, and without limitation, claim 1 of the '403 patent.

34.     Claim 1 of the '403 patent recites:

Apparatus for remotely monitoring and assessing the status of a human subject, the apparatus comprising:

at least one automatic sensor associated with and monitoring the condition of the human subject; and

a portable monitoring unit capable of communicating with a central monitoring device, the portable monitoring unit comprising:

a programmable microprocessor in communication with the at least one automatic sensor, the microprocessor being responsive to the occurrence of any of a set of activating parameters, the activating parameters selected from the group consisting of a preselected state of the at least one automatic sensor and a request signal from an external source,

a first transceiver in communication with the microprocessor, for communicating signals between the microprocessor and the central monitoring device, and

a power supply connected to provide power to at least one of the microprocessor and the first transceiver.

35.    To the extent the preamble is considered a limitation, the MoMe® Kardia System satisfies the preamble of claim 1 of the '403 patent:  "Apparatus for remotely monitoring and assessing the status of a human subject."  The MoMe® Kardia System is a "remote physiologic monitoring system that detects non-life threatening arrhythmias" in humans.  (Ex. H, pg. 5.)

36.    The MoMe® Kardia System satisfies the following limitation of claim 1 of the '403 patent:  "at least one automatic sensor associated with and monitoring the condition of the human subject."  The MoMe® Kardia System "incorporates a front end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to a dedicated smartphone that continuously transmits the data to remote server."  (Ex. H, pg. 5.)  It contains two ECG leads/channels and four electrodes for the collection of ECG data.  (Ex. H, pg. 7.)

37.    The MoMe® Kardia System satisfies the following limitation of claim 1 of the '403 patent:  "a portable monitoring unit capable of communicating with a central monitoring device."  The ECG data is transmitted from the "front end device worn by the patient" to a "remote server" and "[t]he system then uses proprietary algorithms to continually analyze data and provide reports of detected events."  (Ex. H, pg. 5.)  The MoMe® Kardia System is a "cloud computing based ambulatory ECG monitoring and arrhythmia detection system" that uses

"[c]ustom software [to analyze] transmitted data in the cloud for occurrence of arrhythmia."  (Ex. K (presentation paper for Heart Rhythm Society (HRS) Annual Scientific Session 2014).)

38.     The MoMe® Kardia System satisfies the following limitation of claim 1 of the '403 patent:  "the portable monitoring unit comprising[] a programmable microprocessor in communication with the at least one automatic sensor, the microprocessor being responsive to the occurrence of any of a set of activating parameters, the activating parameters selected from the group consisting of a preselected state of the at least one automatic sensor and a request signal from an external source."  The programmable microprocessor of the remote MoMe® Kardia device controls the collection of ECG data from the electrodes and sends it to the MoMe® Kardia cloud server for analysis.  (Ex. K.)   The microprocessor also accepts requests for data from the MoMe® Kardia cloud server upon the detection of an arrhythmia in order to provide information necessary to perform a high definition verification.  (*Id.*)

39.     The MoMe® Kardia System satisfies the following limitation of claim 1 of the '403 patent:  "the portable monitoring unit comprising … a first transceiver in communication with the microprocessor, for communicating signals between the microprocessor and the central monitoring device."  The ECG data is "transmitted from the device via Bluetooth® to a Smart Phone and subsequently uploaded to the cloud on a 3G commercial cellular network."  (Ex. K; *see also* Ex. H, pg. 7.)

40.     The MoMe® Kardia System satisfies the following limitation of claim 1 of the '403 patent:  "the portable monitoring unit comprising … a power supply connected to provide power to at least one of the microprocessor and the first transceiver."  The MoMe® Kardia device includes a battery that provides power to the microprocessor and Bluetooth® transceiver and the Smart Phone includes a battery that provides power to the cellular transceiver.  (Ex. K.)

41.    InfoBionic became aware of the '403 patent at least as early as January 13, 2015, when counsel for Plaintiffs informed counsel for InfoBionic of the '403 patent during a telephone conversation addressing InfoBionic's infringement of CardioNet intellectual property, including the '403 patent.

42.    Upon information and belief, InfoBionic likely became aware of the '403 patent long before January 13, 2015, through the knowledge of its multiple executives who were former executives or employees of CardioNet who had extensive responsibilities involving CardioNet's patented technologies.

43.    InfoBionic has committed and continues to commit acts of infringement under 35 U.S.C. § 271.  Upon information and belief, InfoBionic's acts of infringement are willful, intentional, and without lawful justification, entitling Plaintiffs to damages and treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.  In committing these acts of infringement, InfoBionic acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '403 patent, and InfoBionic actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '403 patent.

44.    The acts of infringement by InfoBionic set forth above have caused and will cause Plaintiffs irreparable harm for which they have no adequate remedy at law, and will continue unless enjoined by this Court.

## COUNT II - INFRINGEMENT OF '901 PATENT

45.    InfoBionic has infringed and is continuing to infringe the '901 patent by making, using, selling, offering for sale, and/or importing in the United States and in this Judicial District,

products, and/or software that incorporate or make use of one or more of the inventions covered

by the '901 patent, including but not limited to the MoMe® Kardia System, thereby infringing

one or more claims of the '901 patent.

46.     InfoBionic's MoMe® Kardia System satisfies each and every element of one or

more claims of the '901 patent, for example, and without limitation, claim 1 of the '901 patent.

47.     Claim 1 of the '901 patent recites:

Apparatus for remotely monitoring and assessing the status of a human subject,
    the apparatus comprising:

a central monitoring device;

at least one automatic sensor associated with and monitoring the condition of the
    human subject; and

a portable monitoring unit capable of communicating with the central monitoring
    device, the portable monitoring unit comprising

a remotely programmable microprocessor in communication with the at least one
    automatic sensor, the microprocessor being responsive to the occurrence of
    any of a set of activating parameters for an activation condition selected from
    the group consisting of a preselected state for the at least one automatic sensor
    and a request signal from an external source,

a first transceiver in communication with the microprocessor, for communicating
    signals between the microprocessor and the central monitoring device, and

a power supply connected to provide power to the microprocessor and to the first
    transceiver.

48.     To the extent the preamble is considered a limitation, the MoMe® Kardia System

satisfies the preamble of claim 1 of the '901 patent:  "Apparatus for remotely monitoring and

assessing the status of a human subject."  The MoMe® Kardia System is a "remote physiologic

monitoring system that detects non-life threatening arrhythmias" in humans.  (Ex. H, pg. 5.)

49.     The MoMe® Kardia System satisfies the following limitation of claim 1 of the

'901 patent:  "a central monitoring device."  ECG data gathered by the MoMe® Kardia device is

transmitted to a "remote server" and "[t]he system then uses proprietary algorithms to continually analyze data and provide reports of detected events." (Ex H, pg. 5.) The MoMe® Kardia System is a "cloud computing based ambulatory ECG monitoring and arrhythmia detection system" that uses "[c]ustom software [to analyze] transmitted data in the cloud for occurrence of arrhythmia." (Ex. K.)

50.    The MoMe® Kardia System satisfies the following limitation of claim 1 of the '901 patent:  "at least one automatic sensor associated with and monitoring the condition of the human subject."  The MoMe® Kardia System "incorporates a front end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to a dedicated smartphone that continuously transmits the data to remote server." (Ex. H, pg. 5.)  It contains two ECG leads/channels and four electrodes for the collection of ECG data.  (Ex. H, pg. 7.)

51.    The MoMe® Kardia System satisfies the following limitation of claim 1 of the '901 patent:  "a portable monitoring unit capable of communicating with the central monitoring device."  The MoMe® Kardia System "incorporates a front end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to a dedicated smartphone that continuously transmits the data to remote server." (Ex. H, pg. 5.)  The MoMe® Kardia System is a "cloud computing based ambulatory ECG monitoring and arrhythmia detection system" that uses "[c]ustom software [to analyze] transmitted data in the cloud for occurrence of arrhythmia." (Ex. K.)

52.    The MoMe® Kardia System satisfies the following limitation of claim 1 of the '901 patent:  "the portable monitoring unit comprising a remotely programmable microprocessor in communication with the at least one automatic sensor, the microprocessor being responsive to the occurrence of any of a set of activating parameters for an activation condition selected from

the group consisting of a preselected state for the at least one automatic sensor and a request signal from an external source."  The programmable microprocessor of the remote MoMe® Kardia device controls the collection of ECG data from the electrodes and sends it to a MoMe® Kardia cloud server for analysis.  (Ex. K.)  The microprocessor also accepts requests for data from the MoMe® Kardia cloud server upon the detection of an arrhythmia in order to provide information necessary to perform a high definition verification.  (*Id.*)  The microprocessor is remotely programmable because it is able to accept data and instructions from the MoMe® Kardia cloud server.

53.     The MoMe® Kardia System satisfies the following limitation of claim 1 of the '901 patent:  "the portable monitoring unit comprising … a first transceiver in communication with the microprocessor, for communicating signals between the microprocessor and the central monitoring device."  The ECG data is "transmitted from the device via Bluetooth® to a Smart Phone and subsequently uploaded to the cloud on a 3G commercial cellular network."  (Ex. K; *see also* Ex. H, pg. 7.)

54.     The MoMe® Kardia System satisfies the following limitation of claim 1 of the '901 patent:  "the portable monitoring unit comprising … a power supply connected to provide power to the microprocessor and to the first transceiver."  The device includes a battery that provides power to the microprocessor and Bluetooth® transceiver and the Smart Phone includes a battery that provides power to the cellular transceiver.  (Ex. K.)

55.     InfoBionic became aware of the '901 patent at least as early as July 20, 2012, which is the date of the first citation of the '901 patent as prior art of record during the prosecutions of U.S. Patent Nos. 8,478,418, 8,744,561, and 8,774,932, all of which have been assigned to InfoBionic.  Additionally, on October 28, 2014, counsel for Plaintiffs informed

InfoBionic of the '901 patent during a telephone conversation addressing InfoBionic's infringement of CardioNet intellectual property, including the '901 patent.

56.     Upon information and belief, InfoBionic likely became aware of the '901 patent long before July 20, 2012, through the knowledge of its multiple executives who were former executives or employees of CardioNet who had extensive responsibilities involving CardioNet's patented technologies.

57.     InfoBionic has committed and continues to commit acts of infringement under 35 U.S.C. § 271.  Upon information and belief, InfoBionic's acts of infringement are willful, intentional, and without lawful justification, entitling Plaintiffs to damages and treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.  In committing these acts of infringement, InfoBionic acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '901 patent, and InfoBionic actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '901 patent.

58.     The acts of infringement by InfoBionic set forth above have caused and will cause Plaintiffs irreparable harm for which they have no adequate remedy at law, and will continue unless enjoined by this Court.

## COUNT III - INFRINGEMENT OF '850 PATENT

59.     InfoBionic has infringed and is continuing to infringe the '850 patent by making, using, selling, offering for sale, and/or importing in the United States and in this Judicial District, products, software, and/or services that incorporate or make use of one or more of the inventions

covered by the '850 patent, including but not limited to the MoMe® Kardia System, thereby infringing one or more claims of the '850 patent.

60.     InfoBionic's MoMe® Kardia System satisfies each and every element of one or more claims of the '850 patent, for example, and without limitation, claim 31 of the '850 patent.

61.     Claim 31 of the '850 patent recites:

A system for reporting information related to arrhythmia events comprising:

a monitoring system configured to process and report physiological data, including heart rate data, for a living being and configured to identify arrhythmia events from the physiological data;

a monitoring station for receiving the physiological data from the monitoring system;

a processing system configured to receive arrhythmia information from the monitoring system and configured to receive human-assessed arrhythmia information from the monitoring station wherein the human-assessed arrhythmia information derives from at least a portion of the physiological data and wherein the processing system is capable of pictographically presenting, using a common time scale, information regarding the heart rate data during a defined time period and regarding duration of arrhythmia event activity, according to the identified arrhythmia events, during the defined time period such that heart rate trend is presented with arrhythmia event burden.

62.     To the extent the preamble is considered a limitation, the MoMe® Kardia System satisfies the preamble of claim 31 of the '850 patent: "A system for reporting information related to arrhythmia events." The MoMe® Kardia System is a "remote physiologic monitoring system that detects non-life threatening arrhythmias" in humans and "uses proprietary algorithms to continually analyze data and provide reports of detected events." (Ex. H, pg. 5.)

63.     The MoMe® Kardia System satisfies the following limitation of claim 31 of the '850 patent: "a monitoring system configured to process and report physiological data, including heart rate data, for a living being and configured to identify arrhythmia events from the physiological data." The MoMe® Kardia System "incorporates a front end device worn by the

patient that collects and streams ECG, heart rate and motion (activity) to a dedicated smartphone that continuously transmits the data to remote server." (Ex. H, pg. 5.) The MoMe® Kardia System is a "cloud computing based ambulatory ECG monitoring and arrhythmia detection system" that uses "[c]ustom software [to analyze] transmitted data in the cloud for occurrence of arrhythmia." (Ex. K.)

64. The MoMe® Kardia System satisfies the following limitation of claim 31 of the '850 patent: "a monitoring station for receiving the physiological data from the monitoring system." The "recording unit [is] capable of continuous ECG capture" and the ECG data is "transmitted from the device via Bluetooth® to a Smart Phone and subsequently uploaded to the cloud on a 3G commercial cellular network." (Ex. K.) The MoMe® Kardia cloud server receives ECG data from the recording unit and assessments of the detected arrhythmias from technicians and physicians via a computer interface. (Ex. K ("The event data, automatically detected and patient-triggered, was successfully uploaded and analyzed on the cloud server in all 20 patients. Events were able to be reviewed by the research team during the monitoring period."; "Demonstrated clinical feasibility of a cloud computing based ECG ambulatory monitoring system"; "… streamlining the clinician-computer interaction …"; "Confirmation of arrhythmia within 72 hours").)

65. The MoMe® Kardia System satisfies the following limitation of claim 31 of the '850 patent: "a processing system configured to receive arrhythmia information from the monitoring system and configured to receive human-assessed arrhythmia information from the monitoring station wherein the human-assessed arrhythmia information derives from at least a portion of the physiological data and wherein the processing system is capable of pictographically presenting, using a common time scale, information regarding the heart rate data

during a defined time period and regarding duration of arrhythmia event activity, according to the identified arrhythmia events, during the defined time period such that heart rate trend is presented with arrhythmia event burden."

66.     The MoMe® Kardia cloud server receives ECG data from the recording unit and assessments of the detected arrhythmias from technicians and physicians via a computer interface.  (Ex. K ("The event data, automatically detected and patient-triggered, was successfully uploaded and analyzed on the cloud server in all 20 patients.  Events were able to be reviewed by the research team during the monitoring period."; "Demonstrated clinical feasibility of a cloud computing based ECG ambulatory monitoring system"; "… streamlining the clinician-computer interaction …"; "Confirmation of arrhythmia within 72 hours").)

67.     Below is a reporting interface (copied from Ex. K) for the MoMe® Kardia System with added annotations.  The display shows the number of events pending review and the review button that a clinician or physician would use to complete the review (*see* green ovals). The MoMe® Kardia cloud server presents information regarding heart rate data (*see* yellow oval highlighting heart rate scale) over a 24-hour period on a common time scale with gray circles that present the overall amount of time that a patient is in arrhythmia over a specified time period, taking into account the number and duration of episodes.  When the interface screenshot was captured, the "AFIB" (atrial fibrillation) event category had been selected as indicated by the darker gray highlighting and the presence of "AFIB" events in the main display (*see* blue ovals).  Upon information and belief, the AFIB events are mapped in approximately 30-minute intervals labeled with gray circles on the heart rate trend graph (*see* orange ovals).  Based upon the display, upon information and belief it appears the five detected AFIB events all occurred in three approximately 30-minute intervals given only three gray circles are shown.



68.     InfoBionic became aware of the '850 patent at least as early as Ms. McNamara's first employment with InfoBionic.  Ms. McNamara is currently a member of InfoBionic's management team.  While she was previously employed with CardioNet she became aware of the '850 patent at least due to her involvement in a lawsuit between Plaintiffs and, *inter alia*, Mednet HealthCare Technologies, Inc.

69.     Upon information and belief, InfoBionic likely became aware of the '850 patent also through the knowledge of its multiple other executives who were former executives or

employees of CardioNet who had extensive responsibilities involving CardioNet's patented technologies.

70.     InfoBionic has committed and continues to commit acts of infringement under 35 U.S.C. § 271.  Upon information and belief, InfoBionic's acts of infringement are willful, intentional, and without lawful justification, entitling Plaintiffs to damages and treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.  In committing these acts of infringement, InfoBionic acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '850 patent, and InfoBionic actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '850 patent.

71.     The acts of infringement by InfoBionic set forth above have caused and will cause Plaintiffs irreparable harm for which they have no adequate remedy at law, and will continue unless enjoined by this Court.

**COUNT IV - INFRINGEMENT OF '996 PATENT**

72.     InfoBionic has infringed and is continuing to infringe the '996 patent by making, using, selling, offering for sale, and/or importing in the United States and in this Judicial District, products and/or software that incorporate or make use of one or more of the inventions covered by the '996 patent, including but not limited to the MoMe® Kardia System, thereby infringing one or more claims of the '996 patent.

73.     InfoBionic's MoMe® Kardia System satisfies each and every element of one or more claims of the '996 patent, for example, and without limitation, claim 12 of the '996 patent.

74.     Claim 12 of the '996 patent recites:

21

An article comprising a machine-readable medium embodying information
indicative of instructions that when performed by one or more machines result
in operations comprising:

identifying atrial fibrillation events in physiological data obtained for a living
being, wherein identifying atrial fibrillation events comprises examining the
physiological data in multiple time intervals, and identifying intervals in
which at least one atrial fibrillation event has occurred;

obtaining heart rate data for the living being;

receiving a human assessment of a subset of the identified atrial fibrillation
events; and

based on the human assessment of the subset of the identified atrial fibrillation
events, pictographically presenting, using a common time scale, information
regarding the heart rate data for the multiple time intervals during a defined
time period in alignment with indications of atrial fibrillation activity for the
identified intervals, according to the identified atrial fibrillation events, during
the defined time period such that heart rate trend is presented with atrial
fibrillation burden, wherein pictographically presenting information regarding
the heart rate data comprises displaying for each of the multiple time intervals
a range of heart rates and a heart rate average.

75.     To the extent the preamble is considered a limitation, the MoMe® Kardia System

satisfies the preamble of claim 12 of the '996 patent:  "An article comprising a machine-readable

medium embodying information indicative of instructions that when performed by one or more

machines result in operations."  The MoMe® Kardia System is a "remote physiologic

monitoring system that detects non-life threatening arrhythmias" in humans and "uses

proprietary algorithms to continually analyze data and provide reports of detected events."  (Ex.

H, pg. 5.)

76.     The MoMe® Kardia System satisfies the following limitation of claim 12 of the

'996 patent:  "identifying atrial fibrillation events in physiological data obtained for a living

being, wherein identifying atrial fibrillation events comprises examining the physiological data

in multiple time intervals, and identifying intervals in which at least one atrial fibrillation event

has occurred."  The MoMe® Kardia System is a "cloud computing based ambulatory ECG

monitoring and arrhythmia detection system" that uses "[c]ustom software [to analyze]
transmitted data in the cloud for occurrence of arrhythmia."  (Ex. K.)  Detected arrhythmias
include atrial fibrillation events identified during intervals of the monitoring period and time-
stamped according to the time of occurrence.  (Ex. K.)

77.     The MoMe® Kardia System satisfies the following limitation of claim 12 of the
'996 patent:  "obtaining heart rate data for the living being."  The MoMe® Kardia System
"incorporates a front end device worn by the patient that collects and streams ECG, heart rate
and motion (activity) to a dedicated smartphone that continuously transmits the data to remote
server."  (Ex. H, pg. 5.)

78.     The MoMe® Kardia System satisfies the following limitation of claim 12 of the
'996 patent:  "receiving a human assessment of a subset of the identified atrial fibrillation
events."  The MoMe® Kardia cloud server receives ECG data from the recording unit and
assessments of some or all of the detected arrhythmias from technicians and physicians via a
computer interface.  (Ex. K ("The event data, automatically detected and patient-triggered, was
successfully uploaded and analyzed on the cloud server in all 20 patients.  Events were able to be
reviewed by the research team during the monitoring period."; "Demonstrated clinical feasibility
of a cloud computing based ECG ambulatory monitoring system"; "… streamlining the clinician-
computer interaction …"; "Confirmation of arrhythmia within 72 hours").)

79.     The MoMe® Kardia System satisfies the following limitation of claim 12 of the
'996 patent:  "based on the human assessment of the subset of the identified atrial fibrillation
events, pictographically presenting, using a common time scale, information regarding the heart
rate data for the multiple time intervals during a defined time period in alignment with
indications of atrial fibrillation activity for the identified intervals, according to the identified

atrial fibrillation events, during the defined time period such that heart rate trend is presented with atrial fibrillation burden, wherein pictographically presenting information regarding the heart rate data comprises displaying for each of the multiple time intervals a range of heart rates and a heart rate average."

80.     Below is a reporting interface (copied from Ex. K) for the MoMe® Kardia System with added annotations.  The display shows the number of events pending review and the review button that a clinician or physician would use to complete the review (*see* green ovals). Upon information and belief, the confirmed atrial fibrillation events will remain on the display of events and rejected events will be removed.  The MoMe® Kardia cloud server presents information regarding heart rate data (*see* yellow oval highlighting heart rate scale) over a 24-hour period on a common time scale with gray circles that present the overall amount of time that a patient is in atrial fibrillation over a specified time period, taking into account the number and duration of episodes.  When the interface screenshot was captured, the "AFIB" event category had been selected as indicated by the darker gray highlighting and the presence of "AFIB" events in the main display (*see* blue ovals).  Upon information and belief, the AFIB events are mapped in approximately 30-minute intervals labeled with gray circles on the heart rate trend graph (*see* orange ovals).  Based upon the display, upon information and belief it appears the five detected AFIB events all occurred in three approximately 30-minute intervals given only three gray circles are shown.  The display also includes the heart rate minimum, maximum, and average (*see* purple oval).



81.     InfoBionic became aware of the '996 patent at least as early as July 20, 2012, which is the date of the first citation of the '996 patent as prior art of record during the prosecutions of U.S. Patent Nos. 8,478,418, 8,744,561, and 8,774,932, all of which have been assigned to InfoBionic.  Additionally, Ms. McNamara is currently a member of InfoBionic's management team.  While she was previously employed with CardioNet she became aware of the '996 patent at least due to her involvement in a lawsuit between Plaintiffs and, *inter alia*, Mednet HealthCare Technologies, Inc.

82.     Upon information and belief, InfoBionic likely became aware of the '996 patent also through the knowledge of its multiple other executives who were former executives or employees of CardioNet who had extensive responsibilities involving CardioNet's patented technologies.

83.     InfoBionic has committed and continues to commit acts of infringement under 35 U.S.C. § 271.  Upon information and belief, InfoBionic's acts of infringement are willful, intentional, and without lawful justification, entitling Plaintiffs to damages and treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.  In committing these acts of infringement, InfoBionic acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '996 patent, and InfoBionic actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '996 patent.

84.     The acts of infringement by InfoBionic set forth above have caused and will cause Plaintiffs irreparable harm for which they have no adequate remedy at law, and will continue unless enjoined by this Court.

## COUNT V - INFRINGEMENT OF '767 PATENT

85.     InfoBionic has infringed and is continuing to infringe the '767 patent by making, using, selling, offering for sale, and/or importing in the United States and in this Judicial District, products, and/or software that incorporate or make use of one or more of the inventions covered by the '767 patent, including but not limited to the MoMe® Kardia System, thereby infringing one or more claims of the '767 patent.

86.     InfoBionic's MoMe® Kardia System satisfies each and every element of one or more claims of the '767 patent, for example, and without limitation, claim 7 of the '767 patent.

87.     Claim 9 of the '767 patent recites:

A method of monitoring a patient, comprising the steps of providing a monitoring apparatus including

a remote monitoring unit associated with the patient,

a central unit, and

a communications device which selectively establishes a communications link between the remote monitoring unit and the central unit;

the remote monitoring unit obtaining a monitored data set for the patient;

the remote monitoring unit establishing a communications link with the central unit;

the remote monitoring unit transmitting to the central unit an initially transmitted data set related to the monitored data set;

the central unit analyzing the initially transmitted data set to determine whether an additional data set related to the monitored data set is required to be transmitted by the remote monitoring unit;

the central unit, when the additional data set related to the monitored data set is required, instructing the remote monitoring unit that the additional data set is to be transmitted from the remote monitoring unit to the central unit and instructing as to a time at which the additional data set is to be transmitted; and

the remote monitoring unit transmitting the additional data set to the central unit at the time instructed by the central unit based on the initially transmitted data set received from the remote monitoring unit.

88.     To the extent the preamble is considered a limitation, the MoMe® Kardia System satisfies the preamble of claim 9 of the '767 patent:  "A method of monitoring a patient, comprising the steps of providing a monitoring apparatus."  The MoMe® Kardia System is a "remote physiologic monitoring system that detects non-life threatening arrhythmias" in humans.

(Ex. H, pg. 5.)

89.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the

'767 patent:  "a remote monitoring unit associated with the patient."  The MoMe® Kardia

System "incorporates a front end device worn by the patient that collects and streams ECG, heart

rate and motion (activity) to a dedicated smartphone that continuously transmits the data to

remote server."  (Ex. H, pg. 5.)  It contains two ECG leads/channels and four electrodes for the

collection of ECG data.  (Ex. H, pg. 7.)

90.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the

'767 patent:  "a central unit."  ECG data gathered by the MoMe® Kardia device is transmitted to

a "remote server" and "[t]he system then uses proprietary algorithms to continually analyze data

and provide reports of detected events."  (Ex H, pg. 5.)  The MoMe® Kardia System is a "cloud

computing based ambulatory ECG monitoring and arrhythmia detection system" that uses

"[c]ustom software [to analyze] transmitted data in the cloud for occurrence of arrhythmia."  (Ex.

K.)

91.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the

'767 patent:  "a communications device which selectively establishes a communications link

between the remote monitoring unit and the central unit."  The MoMe® Kardia System

"incorporates a front end device worn by the patient that collects and streams ECG, heart rate

and motion (activity) to a dedicated smartphone that continuously transmits the data to remote

server."  (Ex. H, pg. 5.)  The ECG data is "transmitted from the device via Bluetooth® to a

Smart Phone and subsequently uploaded to the cloud on a 3G commercial cellular network."

(Ex. K; *see also* Ex. H, pg. 7.)  The programmable microprocessor of the remote MoMe® Kardia

device controls the collection of ECG data from the electrodes and sends it to a MoMe® Kardia

cloud server for analysis.  (Ex. K.)  The microprocessor also accepts requests for data from the

MoMe® Kardia cloud server upon the detection of an arrhythmia in order to provide information necessary to perform a high definition verification.  (*Id.*)

92.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the '767 patent:  "the remote monitoring unit obtaining a monitored data set for the patient."    The MoMe® Kardia System "incorporates a front end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to a dedicated smartphone that continuously transmits the data to remote server."  (Ex. H, pg. 5.)  It contains two ECG leads/channels and four electrodes for the collection of ECG data.  (Ex. H, pg. 7.)

93.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the '767 patent:  "the remote monitoring unit establishing a communications link with the central unit."  The MoMe® Kardia System "incorporates a front end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to a dedicated smartphone that continuously transmits the data to remote server."  (Ex. H, pg. 5.)  The ECG data is "transmitted from the device via Bluetooth® to a Smart Phone and subsequently uploaded to the cloud on a 3G commercial cellular network."  (Ex. K; *see also* Ex. H, pg. 7.)

94.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the '767 patent:  "the remote monitoring unit transmitting to the central unit an initially transmitted data set related to the monitored data set."  The programmable microprocessor of the remote MoMe® Kardia device controls the collection of ECG data from the electrodes and sends it to a MoMe® Kardia cloud server for analysis.  (Ex. K.)  The microprocessor also accepts requests for data from the MoMe® Kardia cloud server upon the detection of an arrhythmia in order to provide information necessary to perform a high definition verification.  (*Id.*)

95.     The MoMe® Kardia System satisfies the following limitation of claim 9 of the

'767 patent:  "the central unit analyzing the initially transmitted data set to determine whether an

additional data set related to the monitored data set is required to be transmitted by the remote

monitoring unit."  The programmable microprocessor of the remote MoMe® Kardia device

controls the collection of ECG data from the electrodes and sends it to a MoMe® Kardia cloud

server for analysis.  (Ex. K.)  The microprocessor also accepts requests for data from the

MoMe® Kardia cloud server upon the detection of an arrhythmia in order to provide information

necessary to perform a high definition verification.  (*Id.*)

96.     On information and belief, the MoMe® Kardia System satisfies the following

limitation of claim 9 of the '767 patent:  "the central unit, when the additional data set related to

the monitored data set is required, instructing the remote monitoring unit that the additional data

set is to be transmitted from the remote monitoring unit to the central unit and instructing as to a

time at which the additional data set is to be transmitted."

97.     On information and belief, the MoMe® Kardia System satisfies the following

limitation of claim 9 of the '767 patent:  "the remote monitoring unit transmitting the additional

data set to the central unit at the time instructed by the central unit based on the initially

transmitted data set received from the remote monitoring unit."

98.     InfoBionic became aware of the '767 patent at least as early as July 20, 2012,

which is the date of the first citation of the '767 patent (*i.e.*, originally-issued U.S Patent No.

6,694,177) as prior art of record during the prosecutions of U.S. Patent Nos. 8,478,418,

8,744,561, and 8,774,932, all of which have been assigned to InfoBionic.

99.     Upon information and belief, InfoBionic likely became aware of the '767 patent

(or originally-issued U.S Patent No. 6,694,177) long before July 20, 2012, through the

knowledge of its multiple executives who were former executives or employees of CardioNet who had extensive responsibilities involving CardioNet's patented technologies.

100.     InfoBionic has committed and continues to commit acts of infringement under 35 U.S.C. § 271.  Upon information and belief, InfoBionic's acts of infringement are willful, intentional, and without lawful justification, entitling Plaintiffs to damages and treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.  In committing these acts of infringement, InfoBionic acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '767 patent, and InfoBionic actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '767 patent.

101.     The acts of infringement by InfoBionic set forth above have caused and will cause Plaintiffs irreparable harm for which they have no adequate remedy at law, and will continue unless enjoined by this Court.

## COUNT VI - INFRINGEMENT OF '715 PATENT

102.     InfoBionic has infringed and is continuing to infringe the '715 patent by making, using, selling, offering for sale, and/or importing in the United States and in this Judicial District, products, and/or software that incorporate or make use of one or more of the inventions covered by the '715 patent, including but not limited to the MoMe® Kardia System, thereby infringing one or more claims of the '715 patent.

103.     InfoBionic's MoMe® Kardia System satisfies each and every element of one or more claims of the '715 patent, for example, and without limitation, claim 20 of the '715 patent.

104.     Claim 20 of the '715 patent recites:

A cardiac monitoring apparatus comprising:

a communications interface;

a real-time heart beat detector;

a frequency domain T wave filter; and

a selector that activates the frequency domain T wave filter with respect to the
real-time heart beat detector in response to a message, wherein the activated
frequency domain T wave filter preprocesses a cardiac signal provided to the
real-time heart beat detector.

105.    To the extent the preamble is considered a limitation, the MoMe® Kardia System

satisfies the preamble of claim 20 of the '715 patent:  "A cardiac monitoring apparatus."  The

MoMe® Kardia System is a "remote physiologic monitoring system that detects non-life

threatening arrhythmias" in humans and "uses proprietary algorithms to continually analyze data

and provide reports of detected events."  (Ex. H, pg. 5.)

106.    The MoMe® Kardia System satisfies the following limitation of claim 20 of the

'715 patent:  "a communications interface."  The MoMe® Kardia System "incorporates a front

end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to

a dedicated smartphone that continuously transmits the data to remote server."  (Ex. H, pg. 5.)

The ECG data is "transmitted from the device via Bluetooth® to a Smart Phone and

subsequently uploaded to the cloud on a 3G commercial cellular network."  (Ex. K; *see also* Ex.

H, pg. 7.)

107.    The MoMe® Kardia System satisfies the following limitation of claim 20 of the

'715 patent:  "a real-time heart beat detector."  The MoMe® Kardia System "incorporates a front

end device worn by the patient that collects and streams ECG, heart rate and motion (activity) to

a dedicated smartphone that continuously transmits the data to remote server."  (Ex. H, pg. 5.)  It

contains two ECG leads/channels and four electrodes for the collection of ECG data.  (Ex. H, pg. 7.)

108.     On information and belief, the MoMe® Kardia System satisfies the following limitation of claim 20 of the '715 patent:  "a frequency domain T wave filter."

109.     On information and belief, the MoMe® Kardia System satisfies the following limitation of claim 20 of the '715 patent:  "a selector that activates the frequency domain T wave filter with respect to the real-time heart beat detector in response to a message, wherein the activated frequency domain T wave filter preprocesses a cardiac signal provided to the real-time heart beat detector."

110.     InfoBionic became aware of the '715 patent at least as early as July 20, 2012, which is the date of the first citation of the '715 patent as prior art of record during the prosecutions of U.S. Patent Nos. 8,478,418, 8,744,561, and 8,774,932, all of which have been assigned to InfoBionic.

111.     Upon information and belief, InfoBionic likely became aware of the '715 patent long before July 20, 2012, through the knowledge of its multiple executives who were former executives or employees of CardioNet who had extensive responsibilities involving CardioNet's patented technologies.

112.     InfoBionic has committed and continues to commit acts of infringement under 35 U.S.C. § 271.  Upon information and belief, InfoBionic's acts of infringement are willful, intentional, and without lawful justification, entitling Plaintiffs to damages and treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.  In committing these acts of infringement, InfoBionic acted despite an objectively high likelihood that its actions constituted infringement of at least one

valid and enforceable claim of the '715 patent, and InfoBionic actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '715 patent.

113.    The acts of infringement by InfoBionic set forth above have caused and will cause Plaintiffs irreparable harm for which they have no adequate remedy at law, and will continue unless enjoined by this Court.

### COUNT VII - MISAPPROPRIATION OF TRADE SECRETS UNDER MASSACHUSETTS GENERAL LAWS, CHAPTER 93, § 42 AND MASSACHUSETTS COMMON LAW

114.    CardioNet repeats and realleges the allegations contained in paragraphs 1 through 113 as if fully set forth here.

115.    Source code developed by, and on behalf of, CardioNet for the MCOT<sup>TM</sup> System, including but not limited to the algorithms for the detection of atrial fibrillation, constitutes trade secret information under Mass. Gen. Laws c. 93, § 42 and Massachusetts common law.

116.    CardioNet took and continues to take reasonable steps to protect the secrecy of this information, including by limiting access to this information and requiring employees to sign nondisclosure and confidentiality agreements.  CardioNet has expended significant amounts of effort and money to develop this trade secret information.

117.    InfoBionic knowingly benefited from the use of CardioNet's trade secrets, including source code, which were wrongfully acquired and/or retained by Dr. Kuppuraj in breach of a confidential relationship and contractual agreements, including the Proprietary Information Agreement, Employment Agreement, and/or Confidentiality and Non-Disclosure Agreement.

118.    Upon information and belief, Dr. Kuppuraj provided CardioNet 's trade secrets to InfoBionic in breach of his contractual obligations to CardioNet, and InfoBionic misappropriated misused CardioNet's trade secrets by illegally copying and/or using CardioNet's source code, including an atrial fibrillation detection algorithm, in the MoMe® Kardia System.

119.    InfoBionic's use of CardioNet's trade secrets is a violation of Mass. Gen. Laws c. 93, § 42 and Massachusetts common law.

120.    InfoBionic's misappropriation has resulted in damages to CardioNet and unjust enrichment to InfoBionic in an amount to be proved at trial, but in any event no less than $75,000.  Additionally, these actions have caused, and continue to cause, irreparable harm to CardioNet for which CardioNet has no adequate remedy at law.  As a result, InfoBionic should be enjoined from any further use of misappropriated CardioNet trade secrets or other intellectual property.

## COUNT VII - VIOLATION OF PENNSYLVANIA'S UNIFORM TRADE SECRETS ACT

121.    CardioNet repeats and realleges the allegations contained in paragraphs 1 through 120 as if fully set forth here.

122.    The underlying source code developed by, and/or on behalf of CardioNet, for CardioNet's MCOT<sup>TM</sup> System, including but not limited to the algorithms for the detection of atrial fibrillation, are trade secrets that derive independent economic value from not being generally known and provide CardioNet with a competitive business advantage.

123.    CardioNet took and continues to take reasonable steps to protect the secrecy of its source code and related algorithms, including by limiting access to this information and requiring

employees to sign nondisclosure and confidentiality agreements.  CardioNet has expended significant amounts of effort and money to develop this trade secret information.

124.    InfoBionic, on information and belief through the actions of its Co-Founder Dr. Kuppuraj and in breach of Dr. Kuppuraj's contractual obligations to CardioNet, copied and/or used source code owned by CardioNet, including atrial fibrillation detection algorithms, in InfoBionic's MoMe® Kardia System.  On information and belief, Dr. Kuppuraj illegally shared CardioNet's trade secrets with InfoBionic and InfoBionic used those secrets to develop products for InfoBionic.

125.    InfoBionic misappropriated CardioNet's trade secrets by using CardioNet's source code and atrial fibrillation detection algorithms in its MoMe® Kardia System without CardioNet's consent and in violation of 12 Pa. Cons. Stat. §§5301 et seq.

126.    InfoBionic's misappropriation has resulted in damages to CardioNet and unjust enrichment to InfoBionic in an amount to be proved at trial, but in any event no less than $75,000.  These actions have caused, and continue to cause, irreparable harm to CardioNet for which CardioNet has no adequate remedy at law.  As a result, InfoBionic should be enjoined from any further use of misappropriated CardioNet trade secrets and CardioNet should be awarded actual damages, including, but not limited to, all of InfoBionic's profits derived from its illegal activities as well as punitive damages.

## COUNT VII - UNFAIR COMPETITION UNDER MASSACHUSETTS GENERAL LAWS, CHAPTER 93A, AND PENNSYLVANIA COMMON LAW

127.    CardioNet repeats and realleges the allegations contained in paragraphs 1 through 126 as if fully set forth here.

128.     CardioNet and InfoBionic are persons engaged in trade or commerce as defined

by Mass. Gen. Laws c. 93A.

129.     Through InfoBionic's tortious interference with the Proprietary Information

Agreement, Employment Agreement, and/or Confidentiality and Non-Disclosure Agreement,

and its knowing and willful misappropriation and use of CardioNet's trade secrets for its own

profits, InfoBionic has knowingly and willfully engaged in unfair methods of competition and

unfair or deceptive trade practices.

130.     On information and belief, InfoBionic's unfair methods of competition and unfair

or deceptive trade practices have occurred primarily and substantially within Massachusetts and

most or all of the remaining activities or effects occurred within Pennsylvania.

131.     InfoBionic's engagement in unfair methods of competition and unfair or

deceptive trade practices has resulted in damages to CardioNet and unjust enrichment to

InfoBionic in an amount to be proved at trial, but in any event no less than $75,000.  These

actions have caused, and continue to cause, irreparable harm to CardioNet for which CardioNet

has no adequate remedy at law.


**COUNT VII - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
UNDER MASSACHUSETTS COMMON LAW**

132.     CardioNet repeats and realleges the allegations contained in paragraphs 1 through

131 as if fully set forth here.

133.     The Proprietary Information Agreement, Employment Agreement, and/or

Confidentiality and Non-Disclosure Agreement are valid and binding agreements between

CardioNet and Dr. Kuppuraj, and are supported by adequate consideration.  These Agreements

prohibit Dr. Kuppuraj from, among other things, using or disclosing CardioNet's confidential or

proprietary information, including source code such as CardioNet's atrial fibrillation detection algorithms developed for its MCOT<sup>TM</sup> System.

134.    Upon information and belief, InfoBionic had full knowledge of the Proprietary Information Agreement, Employment Agreement, and/or Confidentiality and Non-Disclosure Agreement at all relevant times.

135.    Upon information and belief, InfoBionic knowingly, intentionally, and willfully induced Dr. Kuppuraj to breach the Proprietary Information Agreement, Employment Agreement, and/or Confidentiality and Non-Disclosure Agreement.  Dr. Kuppuraj co-founded InfoBionic with the knowledge that he would use CardioNet's confidential information in the course of his employment with InfoBionic to develop the MoMe® Kardia System in competition with CardioNet's MCOT<sup>TM</sup> System.

136.    InfoBionic's conduct constituted improper interference with Dr. Kuppuraj's contractual obligations to CardioNet and was done through improper means and/or for an improper purpose.

137.    InfoBionic's wrongful interference with the Proprietary Information Agreement, Employment Agreement, and/or Confidentiality and Non-Disclosure Agreement has resulted in damages to CardioNet and unjust enrichment to InfoBionic in an amount to be proved at trial, but in any event no less than $75,000.  These actions have caused, and continue to cause, irreparable harm to CardioNet for which CardioNet has no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against InfoBionic as follows:

A.    Declaring that the '403 patent was duly and legally issued, and is valid and enforceable;

B.      Declaring that the '901 patent was duly and legally issued, and is valid and enforceable;

C.      Declaring that the '850 patent was duly and legally issued, and is valid and enforceable;

D.      Declaring that the '996 patent was duly and legally issued, and is valid and enforceable;

E.      Declaring that the '767 patent was duly and legally issued, and is valid and enforceable;

E.      Declaring that the '715 patent was duly and legally issued, and is valid and enforceable;

E.      Declaring that InfoBionic has infringed the '403 patent;

F.      Declaring that InfoBionic has willfully infringed the '403 patent;

G.      Declaring that InfoBionic has infringed the '901 patent;

H.      Declaring that InfoBionic has willfully infringed the '901 patent;

I.      Declaring that InfoBionic has infringed the '850 patent;

J.      Declaring that InfoBionic has willfully infringed the '850 patent;

K.      Declaring that InfoBionic has infringed the '996 patent;

L.      Declaring that InfoBionic has willfully infringed the '996 patent;

I.      Declaring that InfoBionic has infringed the '767 patent;

J.      Declaring that InfoBionic has willfully infringed the '767 patent;

K.      Declaring that InfoBionic has infringed the '715 patent;

L.      Declaring that InfoBionic has willfully infringed the '715 patent;

M.    Awarding to Plaintiffs damages caused by InfoBionic's infringement, including all lost profits resulting from InfoBionic's acts of infringement, and reasonable royalties, together with pre-judgment and post-judgment interest;

N.    Awarding to Plaintiffs treble damages for infringement of the '403, '901, '850, '996, '767, and '715 patents as a consequence of InfoBionic's willful infringement;

O.    Preliminarily and permanently enjoining InfoBionic, its officers, agents, servants, employees, attorneys, all parent and subsidiary corporations and affiliates, its assigns and successors in interest, and those persons in active concert or participation with InfoBionic who receive notice of the injunction, from continuing acts of infringement of the '403, '901, '850, '996, '767, and '715 patents;

P.    Adjudging this an exceptional case and awarding to Plaintiffs their reasonable attorneys fees pursuant to 35 U.S.C. § 285;

Q.    Declaring that InfoBionic has misappropriated CardioNet's trade secrets under Massachusetts General Laws, Chapter 93, § 42 and Massachusetts Common Law;

R.    Declaring that InfoBionic violated Pennsylvania's Uniform Trade Secrets Act;

S.    Declaring that InfoBionic has engaged in unfair competition under Massachusetts General Laws, Chapter 93A and Pennsylvania Common Law;

T.    Declaring that InfoBionic has engaged in tortious interference with contractual relations under Massachusetts Common Law;

U.    Preliminarily and permanently enjoining InfoBionic, its officers, agents, servants, employees, attorneys, all parent and subsidiary corporations and affiliates, its

assigns and successors in interest, and those persons in active concert or participation with InfoBionic who receive notice of the injunction, from any and all disclosures or uses of Plaintiffs' trade secrets;

V.      Awarding to Plaintiffs all available damages, including compensatory damages, exemplary damages, and/or damages for unjust enrichment, resulting from InfoBionic's misappropriation of trade secrets under Massachusetts General Laws, Chapter 93, § 42 and Massachusetts Common Law;

W.      Awarding to Plaintiffs all available damages, including compensatory damages, exemplary damages, and/or damages for unjust enrichment, resulting from InfoBionic's violation of Pennsylvania's Uniform Trade Secrets Act;

X.      Awarding to Plaintiffs all available damages, including compensatory damages, exemplary damages, and/or damages for unjust enrichment, to compensate for InfoBionic's unfair competition under Massachusetts General Laws, Chapter 93A, and Pennsylvania Common Law;

Y.      Awarding to Plaintiffs all available damages, including compensatory damages, exemplary damages, and/or damages for unjust enrichment, to compensate for InfoBionic's tortious interference with contractual relations under Massachusetts Common Law;

Z.      Awarding to Plaintiffs punitive damages in an amount to be decided by this Court; and

AA.      Awarding to Plaintiffs their costs and disbursements incurred in this action;

BB.      Awarding to Plaintiffs such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all of the

claims so triable.


Respectfully submitted,


ROPES & GRAY LLP


Dated:  March 24, 2016                    By: /s/ *Bradford B. Badke*
_____

                                        Bradford J. Badke (*pro hac vice*)
                                        Ching-Lee Fukuda (*pro hac vice*)
                                        SIDLEY AUSTIN LLP
                                        787 Seventh Avenue
                                        New York, NY 10019
                                        +1 212 839 5300

                                        Todd M. Simpson (*pro hac vice*)
                                        Josef B. Schenker (*pro hac vice*)
                                        ROPES & GRAY LLP
                                        1211 Avenue of the Americas
                                        New York, NY 10036-8704
                                        +1 212 596 9000

                                        John P. Bueker (MA B.B.O. # 636435)
                                        ROPES & GRAY LLP
                                        Prudential Tower
                                        800 Boylston Street
                                        Boston, MA 02199-3600
                                        +1 617 951 7000

                                        *Attorneys for Plaintiffs*